IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 1, 2018

**IN RE LESLEY A.**

**Appeal from the Juvenile Court for Roane County**
**No. 2018-JC-7      Terry Stevens, Judge**

_____

**No. E2018-00594-COA-R3-PT**

_____

Mother appeals the trial court's determination that her parental rights to her daughter
should be terminated on the grounds of substantial noncompliance with the permanency
plans, abandonment by failure to provide a suitable home, and persistence of conditions.
Having concluded that clear and convincing evidence supports the trial court's decisions
regarding grounds as well as its determination that termination is in the best interest of
the child, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD,
P.J., W.S., and JOHN W. MCCLARTY, J., joined.

Darrell W. Sproles, Knoxville, Tennessee, for the appellant, Joyce A.

Herbert H. Slatery, III, Attorney General and Reporter, and Alexander S. Rieger, Deputy
Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Joyce A. ("Mother") is the mother of Lesley A., born in March 2004.[1]  On March
10, 2017, a petition was filed against Mother in the juvenile court alleging that Lesley
was a truant child in that she had nineteen unexcused absences during the 2016-17 school
year.  After a hearing, the juvenile court issued a bench order on April 11, 2017, finding
probable cause that Lesley was dependent and neglected based upon evidence of
educational neglect and improper care and supervision.  With respect to reasonable
efforts made to prevent the child's removal from the home, the court noted that Child

_____
[1] Wesley A., the father of Lesley A., is not a party to the present appeal.

Protective Services "has been in the home, but mother is allegedly uncooperative." The juvenile court awarded temporary custody of Lesley to the Department of Children's Services ("DCS" or "the Department") and appointed a guardian ad litem for Lesley. At a preliminary hearing on April 13, 2017, the trial court ordered that Lesley remain in DCS custody and that Mother have supervised visitation. Furthermore, the court ordered Mother to pay fifty dollars ($50) per month in child support.

On April 25, 2017, the Department filed a petition in response to the bench order. In the petition, DCS alleged that, in addition to Lesley's truancy, "[t]here are also issues with drug exposure of the child by the mother due to the mother's improper use of prescription medication." The Department reported that it had worked with Mother in 2016 and required her to complete an alcohol and drug assessment and to follow the resulting recommendations; according to DCS, Mother "has not completed any of the requested services." The Department requested that Lesley remain in its custody. The court held an adjudicatory hearing on May 10, 2017, and determined that Lesley should remain in DCS custody with Mother having supervised visitation.

On May 1, 2017, the Department met with Mother to develop a permanency plan with goals of returning Lesley to Mother or allowing her to exit DCS custody with a relative. (The requirements of the permanency plans will be discussed later in this opinion.) The goal target date was November 1, 2017. The juvenile court ratified the permanency plan in an order entered on June 13, 2017.

On November 30, 2017, the juvenile court entered an order requiring Mother to provide DCS with the name and contact information for every doctor she had seen over the past year for medical or mental health care and the name of every pharmacy where she had filled a prescription. The court further ordered that Mother was under a continuing obligation to update the Department with new information regarding her medical and mental health care. At a hearing on December 4, 2017, DCS asserted that Mother had not complied with the court's previous order to disclose all medical providers, and the trial court found her to be in contempt. The court gave Mother until December 18, 2017 to improve her level of compliance. At that time, the court found Mother was still not in compliance "although she has made attempts." The court further found that "the Department has made all reasonable efforts to assist with the underlying drug issues but cannot successfully do this without [Mother's] assistance."

The Department developed a second permanency plan on December 17, 2017, with the same goals as those in the original plan. The revised permanency plan was approved by the court at a permanency hearing on December 18, 2017. The court noted that Mother was not cooperating with DCS.

On January 19, 2018, the Department filed a petition to terminate the parental rights of Mother and Lesley's father. The petition alleged that Mother's parental rights

were subject to termination on the grounds of substantial noncompliance with the permanency plans pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2); abandonment by failure to provide a suitable home pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); and persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3).

<u>The trial</u>

The court heard the case on March 14, 2018. Mother was the Department's first witness. She acknowledged that Lesley had been in foster care twice before, once as an infant in Florida for about a month after a domestic assault incident and another time in Tennessee for about three months in 2013 based upon "false allegations" by the child's father and others. Mother testified that she had been receiving disability benefits since approximately 2006 due to multiple physical problems, including her back and hands. In April 2016, Mother reported, she was in a car accident that caused injuries to her back.

At the time of the hearing, Mother stated, she lived on Andy Cooper Road in Lancing, Tennessee and had been renting there since the end of February 2018. Prior to that time, she lived with Gary Webb for about a month and a half, and before that she had been homeless since November 2017, when she was staying on McElhaney Road in Ten Mile, Tennessee. Prior to November 2017, Mother lived with Mabel Webb in Wartburg, Tennessee for three or four months. Before she lived with Ms. Webb, Mother lived in Rockwood, Tennessee for approximately two and a half years. Mother testified that she left the house in Rockwood because she noticed that her daughter "was tied up and being influenced by the other kids" and there "was too much drama there." Mother and Lesley were still in Rockwood when Lesley was taken into DCS custody in April 2017.

Mother testified that she met Ms. Webb through a television advertisement and paid around $300 in rent. She left Ms. Webb's house because Ms. Webb had dementia and there were bed bugs in the home. Mother stayed with Steve Colburn, a man she had met a few times, for about a month before moving into the place in Ten Mile for four or five months. Gary Webb, a friend, helped Mother by spending money to fix up the Ten Mile property to put it in livable condition. She testified that she still owed him about $3,000. The agreement was that Mother would rent to own the property. Mother had to leave the place in Ten Mile because the property was foreclosed upon due to the owner's failure to pay taxes.

Mother received $750 a month in Social Security disability benefits. She also received food stamps.

When she lived in Florida, Mother testified, she received substance abuse services. She admitted being an alcoholic, but stated that she had not had a drink in years. Mother further testified that she did not abuse any other substances. She took prescription drugs

as prescribed. Mother stated that her prescription drugs were gabapentin, tramadol, and sometimes Percocet,[2] as well as arthritis medications. She explained that she took gabapentin for inflammation and pinched nerves, tramadol for breakthrough pain, and Percocet for pain. Mother reviewed the dosages and how many of each medication she took every day.

The Department spent a significant amount of time questioning Mother about her medical history and prescription drug use.[3] Mother testified that Dr. Segar prescribed most of her pain medications, unless she was referred to another doctor for treatment. After the car accident in April 2016, Mother received treatment at the hospital and was referred to several specialists. According to Mother, she "broke" her back again a year after the car accident. In August and September 2017, her pharmacy records showed multiple prescriptions for oxycodone, some from the emergency room, some from Dr. Clark (her primary care physician), and some from Dr. Segar. In April 2017, Mother tried taking suboxone, but found that it did not relieve her pain.

When asked about the mental health assessment, Mother stated that she completed a questionnaire on the computer, which counsel for the Department identified as an addiction severity index. Mother admitted that she could not "read half of it, so I didn't put in answers." Counsel responded: "So you weren't honest on it, because you didn't read the question?"[4] After learning more about Mother's prescription drugs, the Department recommended that she go to inpatient treatment. Mother testified that she did not think she needed inpatient treatment because she did not think she had a drug issue. The Department reminded Mother that, when Lesley was in DCS custody in 2013, an alcohol and drug assessment resulted in a recommendation for inpatient treatment. Mother responded that she had weaned herself off of the medications at issue in 2013.

Mother completed multiple assessments through DCS, including an alcohol and drug assessment and a mental health assessment. In June 2017, Mother first went to Ridgeview because she wanted a second opinion and she needed a therapist. An assessment was completed at Ridgeview on June 27, 2017. Mother began seeing Paul Taylor at Ridgeview for regular counseling in January 2018.

---

[2] Percocet is the brand name for a drug containing oxycodone and acetaminophen.

[3] The medical records referenced by the Department in its questioning of Mother are not in the record on appeal.

[4] The Court notes that the Department often employed an unnecessarily combative and disrespectful tone in its questioning of Mother, who tested at a low level of intelligence and exhibited poor literacy on a mental status examination.

When asked whose fault it was that Lesley was in DCS custody, Mother said it was her fault that Lesley was truant. As to the period in 2013 when Lesley was in DCS custody for sexual abuse, Mother testified that she had not been aware that the abuse was occurring at the home where she dropped Lesley off for tutoring until Lesley started exhibiting signs of abuse.

On cross-examination, Mother was questioned about the assessment by Dr. Brietstein in August 2017 in which he made four recommendations.[5] One of Dr. Brietstein's recommendations was for Mother to participate in family therapy, and Mother testified that she did not disagree with this recommendation; she was waiting for the Department to make a referral. The second recommendation was for Mother to continue having random drug screens, which was not new because the court had already ordered Mother to submit to random drug screens. Dr. Brietstein's third recommendation was for Mother to participate in a twelve-step program to remain clean and sober. Mother objected to this recommendation because she maintained that she was a recovered alcoholic and felt that she did not need to be in a twelve-step program. Dr. Brietstein recommended that Mother complete parenting classes, particularly focused on enforcing consequences and maintaining healthy boundaries. Mother responded that she had worked on these issues in one parenting class and was about to participate in another one. Dr. Brietstein's final recommendation was for Mother to undergo individual therapy for panic disorder, an issue Mother felt she was addressing through other means. It was Mother's opinion that she had been compliant with all of Dr. Brietstein's recommendations with the exception of family therapy, which she was willing to do if the Department arranged it.

Mother testified about her memory problems, especially immediately after the car accident, and stated that she was allergic to Tylenol, morphine, and penicillin. It was her understanding that the car accident had caused a fracture in her back. Mother testified that she texted her caseworker on February 27, 2018, to inform DCS of her new address in Lancing as well as information about her new primary care physician, Linda Cole.

The guardian ad litem asked Mother a few questions. Mother testified that, when Lesley's truancy problems began, she was being bullied at school. Mother tried to address the issue by talking to the school and to the parents of the other child. Mother would watch Lesley get on the bus. After the Department became involved, Mother learned that another parent was allowing Lesley into that parent's apartment with the other parent's child, where they would smoke marijuana. The school sent letters about Lesley's absences, but Lesley would hide them. Mother had been taking Lesley to counseling since the 2013 sexual abuse that resulted in Lesley's time in DCS custody.

---

[5] Dr. Brietstein's assessment does not appear in the record on appeal.

Mother testified that, since Lesley had been in DCS custody, she had exercised visitation once or twice a month, although there had been several cancellations around Christmas, and Mother had not been able to give Lesley the birthday cake she made for her. Mother spoke with Lesley on the telephone three days a week.

Carrie Watkins, a forensic interviewer with the Child Advocacy Center, stated that she interviewed Lesley, who disclosed that she had been touched by her uncle on the breast and the vagina more than one time. Lesley informed her mother about a week or two after this happened, and her mother became angry and called the uncle's girlfriend/wife.

The Department's next witness was Dr. Howard Abraham Brietstein, a clinical psychologist in private practice who performed a psychological evaluation of Mother on August 15, 2017. With respect to the relevant history regarding Mother, Dr. Brietstein noted that she denied being high or intoxicated at the time of the car accident in 2016. She admitted that her blood test showed that she had tramadol and Xanax in her system, but claimed she had a prescription for both drugs and asserted that all charges against her had been dropped. Dr. Brietstein testified that Mother did not accept responsibility for her daughter's truancy, her own substance abuse, or any other issues. The Department asked Dr. Brietstein whether it would cause him concern to know that Mother "was also taking multiple prescriptions of oxycodone, gabapentin, clonazepam?"[6] He stated that such drugs are "highly addictive" and would cause him concern in light of her history of drug abuse as described by DCS. When the Department continued to question Dr. Brietstein regarding the effect of using such drugs, he stopped the questioner and stated that such information was beyond the scope of his practice.

Dr. Brietstein testified that Mother scored very low on intelligence testing. The abbreviated IQ test he administered yielded a general ability index of 70, which placed her in the borderline range of intelligence. He noted, however, that because he used the abbreviated test, Mother's actual ability could be "somewhat higher" or "somewhat lower." Dr. Brietstein stated that, based on Mother's score, he could not say that she was intellectually disabled, "but we can say that she's not particularly smart, that she has some cognitive deficiencies that would affect her judgment, her reasoning ability, and that would cause some concern about how well she reasons things out when she makes decisions."

Mother exhibited a low reading level—a very beginning fourth grade level. The personality test Dr. Brietstein administered required at least a fourth grade reading level to be able to read the test. Mother omitted a lot of items on the test. For those items Mother did complete, "the test suggested that it was not a valid test and that probably she could not understand the questions." Dr. Brietstein concluded that it was an invalid test.

---

[6] The records to support this question do not appear in the record on appeal.

Based upon his evaluation of Mother, Dr. Brietstein reached the following conclusions:

> Well, first, I would say that she does not keep good boundaries with her daughter, that she does not really have a very solid adult/child relationship with her daughter, that she does not provide adequate supervision with her daughter, that she is somewhat mentally unstable because of these panic attacks, that she is confused about what is proper in the parent/daughter relationship, that she doesn't make good judgment about what is expected of her as a parent, that I have concerns about the way that she is using medications, mixing medications, even with a little bit that I saw, without knowing about anything else that she didn't tell me, that I have concern about the way that she is using Xanax and tramadol without knowing anything else. I have concern that she shows a complete lack of remorse, takes no responsibility whatsoever for her actions, and I have concerns about that, that she has cognitive deficiencies that make it difficult for her to parent.

To address these concerns, Dr. Brietstein recommended family therapy, random drug screens, parenting classes, and individual therapy for panic disorder.

Darlene Brown, a Health Connect employee who performed an alcohol and drug assessment and mental health evaluation on Mother, testified that she met with Mother on May 29, 2017. Mother informed Ms. Brown that she was taking Percocet and Xanax, but she did not have the Xanax prescription with her. Her urine drug screen was positive for Oxy and BZO (consistent with Percocet and Xanax). The results of a substance abuse screening tool indicated that Mother was "at high probability for existing substance use disorder." Mother also completed a mental health screening form, life events checklist, and social interaction anxiety scale.

Ms. Brown's diagnostic impressions were: general anxiety disorder; provisional benzodiazepine use disorder; alcohol use disorder in sustained remission; rule out PTSD; and likely complicated grief, unresolved. Ms. Brown recommended individual counseling as well as family therapy; coordination of care between primary care physician and mental health medication management provider; parenting classes; pain management referral for alternative pain treatments and second opinion regarding neck surgery; domestic violence victim education classes; consistent contact with child to maintain parent-child bond; supportive assistance to obtain driver's license, insurance, and possibly GED; and possible intensive outpatient program ("IOP")/drug use counseling if client cannot produce Xanax prescription.

Next to the stand was Sarah Steinbruegge, a therapist at Health Connect who performed a mental health assessment on Lesley in May 2016. Lesley reported having two experiences with sexual abuse, the first when she was eight years old by her mother's friend and the second a few years later by an uncle. Ms. Steinbruegge testified that Lesley reported symptoms consistent with posttraumatic stress disorder. Lesley stated that she was "fearful to tell her mother, but she did tell her about it eventually and . . . her mother was supportive."

Abigail Johnson, a case manager with Omni, provided supervision for Mother's visits with Lesley until August or September 2017. Ms. Johnson testified that there were issues with Lesley and Mother arguing during visits, with Mother failing to show up for visits, with Lesley wanting to leave visits, and with inappropriate conversations during visits. Ms. Johnson reported that Lesley wanted to leave visits on two occasions because she and Mother were arguing. The arguments arose because Lesley was "questioning mom on if she was getting what she needed to get done, her classes, things like that that were required of her in order for Lesley to come home." These were not considered appropriate topics for visitation, and Ms. Johnson would redirect the conversation. This occurred at every visit. Ms. Johnson stated that such conversations were an example of role reversal.

Ms. Johnson testified that Mother was required to confirm her visits twenty-four hours prior to the visit, but she did not always comply with this requirement. Sometimes Mother would confirm but not within the time frame. There were also times when Mother failed to appear for a visit. Mother was also required to bring activities, something to entertain them during the visit or to pick a place where the two of them could have fun, such as a park, or to provide a meal. According to Ms. Johnson, Mother did not consistently comply with this requirement.

On two occasions, Ms. Johnson called Mother to confirm visits and identified herself, but she did not think Mother remembered who Ms. Johnson was. Mother seemed to think she was talking to Lesley. At times, Mother behaved erratically and would decide she could not make it to a visit when Ms. Johnson and Lesley were on their way to the visit.

The Department also called Lauren McElhaney, who was a case worker assigned to Lesley's case from the time of her removal in April 2017. She testified that Lesley was initially removed for truancy and neglect; after the hearing, however, the Department raised concerns about substance abuse. At the initial child and family team meeting ("CFTM"), the Department decided to set up visitation through Omni. Ms. McElhaney then discussed the concerns reflected in the permanency plan. She stated that, although Mother did not feel that she need alcohol and drug services, she signed off on the plan.

Ms. McElhaney testified that Health Connect provided an in-home alcohol and drug assessment and recommended outpatient counseling with a mention of IOP if Mother did not provide a copy of her prescriptions. Ms. McElhaney stated that Mother did not, in fact, provide a copy of her prescriptions to DCS, and the Department suggested IOP. Mother did not think that she needed intensive services because she maintained she did not have a drug problem. Nevertheless, the Department made such services available, either in-home or at a community site. At about this time, Ms. McElhaney rotated off of the case. The last that she knew, Mother had not completed the recommendation for IOP services.

As to the random drug screens, Ms. McElhaney testified that she had made a couple of attempts but had been unable to find Mother at the listed addresses to perform a random screen or pill counts. With respect to housing, the issue was that Mother could not be found at the address she gave. Ms. McElhaney described her interactions with Mother as follows:

A. In my interactions with her, a lot of them were kind of argumentative. She argued that she didn't need a lot of this, that she didn't have a drug issue. She argued that we were trying to keep her kid from her purposefully. She argued that she's living at that house, she's living at that house, but I kept telling her I couldn't find her there, and I would always try to explain to her why I needed to find her there or why it would need to be a random visit, because it didn't look like she was living there, and I tried to explain things to her as best as I could, and if she did ask me a question, I would clarify and try to make sure she understood what I was saying.
Q. Did you have to have those conversations with [Mother] repeatedly?
A. Yes.
Q. Over the same issues?
A. Yes.
Q. During the time that you had the case, do you feel that [Mother] was demonstrating consistent forward progress?
A. No.
Q. How would you describe the progress that [Mother] was making?
A. I think it was intermittent at best. I mean, it seemed like she would take a step and, you know, I have housing, I have housing, but we couldn't verify it, or she went for the A&D assessment, but it took her arguing first that she didn't need it before she would just go and do it. It took rescheduling her full psychological before she would get it done. And the visitations, I was getting a lot of reports about visitations and phone calls, inappropriate conversations, arguments, things like that. So I would say it was kind of intermittent.

Q. At any point in the case through your conversations, . . . did [Mother] ever appear to take responsibility for the reasons that Lesley was in custody?
A. No. She blamed Lesley for the truancy issue. She made comments that Lesley knew she had to be in school, she should have been in school. And as far as her being in custody, she blamed the Department. She said that we took her kid away from her. And about her in custody before, she said that it was our fault she was in custody, we are trying to keep her kid from her.
Q. At any point did she ever acknowledge an understanding for the reason there were concerns about her prescription drug use?
A. No. She denies that she has issues with that.
Q. At any time during your pendency of time on the case, were you able to get [Mother] to sign releases for pharmacy records or to get validations of prescriptions or any of that?
A. No.

When Ms. McElhaney rotated off of Mother's case in July 2017, Mother had completed the mental health and alcohol and drug assessments, but not the recommendations. She had also completed the parenting classes. Mother still had transportation issues to resolve, housing and income to be verified, and prescriptions to confirm or random drug screens to provide.

Jennifer Harris took over as the DCS caseworker for Lesley in July 2017. Ms. Harris testified that she visited Mother on August 3 at Mabel Webb's house and administered a random drug screen. Mother tested negative for all substances. Mother was surprised about the test results because she had taken Klonopin the previous night.[7] Ms. Harris then ordered a hair follicle test, which was completed on August 31, 2017, and showed opiates (codeine) and extended opiates (hydrocodone and oxycodone).

Asked to describe her experience working with [Mother], Ms. Harris stated that "[m]ost of the time it's been very hostile, and it's also been a little erratic as far as her mood or attitude as far as cooperation and/or actually working with me." Ms. Harris testified that, at times, Mother did not appear to understand what was happening. For example, when her attorney and others attempted multiple times to explain the need for her to sign medical release forms, as required by the court, Mother "got very upset and refused to sign anymore and left, like just abruptly left." She returned later with her landlord so that he could help her understand, "and she then began to fill out a couple more releases and then again became upset and left." Ms. Harris further testified that

---

[7] After obtaining a court order, Ms. Harris received Mother's pharmacy records for July and August 2017, which showed prescriptions for Klonopin, oxycodone, tramadol, methyltredniaolone, gabapentin, medroxy, progesterone, and tizanidine.

there were times when Mother appeared not to know who Ms. Harris was. For example, in a CFTM, Mother would say something about her case manager, Jennifer, and Ms. Harris would say, "[T]hat's me, I'm your case manager, Jennifer."

Ms. Harris identified her biggest concern regarding this family to be the unaddressed alcohol and drug issues. Second would be Mother's inability to maintain stable housing. Whereas Covenant Counseling had initially been put into place to perform an IOP, that recommendation changed when more information came to light about Mother's substance abuse, which she never admitted, and all of her prescriptions. The recommendation changed to inpatient treatment.

Covenant Counseling therapist Kathy Huff testified that she worked with Mother through an IOP to specifically address substance abuse and related mental health issues beginning in July 2017. The intention was for Ms. Huff to meet with Mother for at least two hours per week, but that did not happen due to Mother's inconsistent participation and poor communication with Ms. Huff. Ms. Huff last saw Mother in December 2017. As of January 2018, they were working to get Mother into an inpatient treatment program.

Ms. Huff reported that Mother quickly completed the entire IOP curriculum. They met at different places on a total of four occasions. During one meeting at Hardee's, Mother behaved erratically. She argued with restaurant staff and was "antsy." As the meeting continued, Mother informed Ms. Huff that she was under the influence of a prescription because she had broken her back. Ms. Huff had to redirect Mother many times because she was distracted. Mother had difficulty reading as they went over the initial treatment plan, so Ms. Huff read it to her, and Mother then signed it. They went over the plan again at their next meeting and, when Mother disagreed with part of it, Ms. Huff took that part out. A few days later, Mother called Ms. Huff and "it was almost like she didn't even remember us going over the initial plan." Mother was upset during this phone conversation, cursed, and threatened to file a complaint against Ms. Huff.

At a CFTM meeting, Ms. Huff and the care team discussed all of Mother's pain medications and decided that inpatient treatment was necessary. Mother did not like the new recommendation. Nevertheless, after talking to her attorney, Mother agreed to comply because she "wanted to keep her child." Ms. Huff gave her the names of some inpatient treatment facilities. Mother also decided to have an evaluation at Ridgeview.

Jessica Howard, Ms. Harris's supervisor at DCS, testified that she had overseen the case when Ms. McElhaney had been the caseworker. Moreover, Ms. Howard was the supervisor the first time Lesley entered foster care. Prior to the time when Lesley came into foster care, Ms. Howard was aware of the sex abuse case because "there were some other children in the home that [the perpetrator] lived in that were removed from that home." When Lesley disclosed the sexual abuse in 2013, she said that it had been going

on for two years, which was the time when the two other children had been removed from the home. Lesley would go over to the home and play with the two girls, and Mother was using the perpetrator as a tutor. According to Ms. Howard's testimony, there was "significant drug use in that home" and "a lot of criminal activity, a lot of people coming in and out." She stated that "[i]t was a known drug house."

Ms. Howard stated that Lesley came into custody in 2013 because her older sister, Victoria, was in court and tested positive for methamphetamines, so the judge asked DCS to try to find Mother so that Lesley could be returned to her. It was the Department's understanding that Mother had left Lesley in Victoria's care. Despite several attempts, the Department was unable to locate Mother, so the judge put Lesley into foster care. The sex abuse case had come to light right before Lesley entered foster care. Although DCS had concerns about Mother's drug use, Mother completed the steps on her permanency plan, so Lesley was returned to her.

The Department's attempts to talk to Mother about her drug problems were met with what Ms. Howard described as "smoke and mirrors." Mother would bring in a shoebox full of medications or a purse full of prescription receipts. Typically, she would have inserts about the benefits and side effects of the medications rather than the actual prescriptions. Mother would not take responsibility for the problems that brought Lesley into foster care. Ms. Howard expressed the following concerns:

> A. . . . Most every time I have ever talked to her, I'm always concerned with the prescriptions that she's on, that she mixes, concerned to the point where I have called the police to say, you know, there's someone leaving our office, she appears to be under the influence, you know, just want to make sure that someone sees her on the road, because it was around time for everyone to be leaving our office; I didn't want anyone to be involved in an accident, but also I have talked to her at length about the concerns we have for her health.
>
> Q. In the multiple Child and Family Team Meetings that you have had, is there progress? . . .
>
> A. Every Child and Family Team Meeting we have, we are constantly rehashing what we already talked about in the previous meeting, to the point where it's just—it's arguing. It's not only arguing with us on whether or not it's true or not, it's her arguing with her own attorney. It's just hard to—it's hard to converse with her, because she doesn't want to take any responsibility for what's happened. So we are never able to, okay, let's take responsibility for this and let's look at what we need to do to resolve that, let's move on. It's constantly defending—she's always in defense mode.
>
> Q. Do you feel like today, given the circumstances, that you could send Lesley home with [Mother] on a trial home visit?

- 12 -

A.  As much as I would love to, there is no way I would feel comfortable with it at all.

Q.  Do you believe that it is in Lesley's best interest to go home to her mother today?

A.  Unfortunately, no, because I would be afraid that Lesley would be in another situation where she was sexually abused due to lack of supervision, that she would be in another car accident, that she would be exposed to any type of drugs, or that Lesley would be so overwhelmed with adult responsibilities, that she would be suffering from depression, anxiety, because Lesley had always appeared to be the caretaker in their relationship.

Finally, Mother testified on her own behalf.  She introduced pictures of her new home into evidence.  The trailer had two bedrooms and one bathroom.  She also submitted a letter from the Social Security Administration documenting her total monthly income to be $766 a month (disability benefits and food stamps).

Mother testified that she faithfully called Lesley according to the weekly schedule allowed by DCS.  She stated that she and Lesley had a close relationship, that she could "pretty much tell what Lesley is doing."  Mother continued:

I can tell the tone of her voice, the way she talks, if she shuts down.  I know my child. . . .  I can tell when something is troubling Lesley.  I can look in her eyes and tell you if she's up to something or, you know, really sit down with her—I just know my baby.

She voiced her understanding that Lesley needed to go to school regardless of bullying and stated that "this has really been a learning lesson."  Mother expressed her willingness to participate in family therapy whenever it was approved.  At present, Mother was going to Ridgeview and receiving therapy with Paul Taylor.

For the past few months, Mother stated, finding stable housing had been her primary focus.  At her new residence in Lancing, Mother lived by herself with her little dog, and there was room for Lesley.  Mother had also signed up for Section 8 housing assistance.  She had access to a car through her landlord, but she still needed to get insurance on it.  Mother already had a valid driver's license.

Before Lesley was summoned to truancy court, Mother took her to Ridgeview to try to get services for her there.  She testified that, if Lesley was allowed to return home, Mother would make sure she went to school and received the family therapy she needed. She understood that, even if she saw Lesley get on the school bus, she needed to follow up with the school to make sure Lesley was attending school.  Mother felt that she and

Lesley had a strong parent/child bond, and she stated that she understood the importance of having appropriate boundaries between parent and child.

## The trial court's decision

After hearing all of the proof, the trial court entered an order dated April 16, 2018, including detailed findings of fact. The court found clear and convincing evidence to support the termination of Mother's parental rights on the grounds of substantial noncompliance with the permanency plan, abandonment by failure to provide a suitable home, and the persistence of conditions. Furthermore, the court found clear and convincing evidence that termination of Mother's parental rights was in the best interest of the child.

Mother appeals the trial court's decision to terminate her parental rights with respect to each of the three grounds as well as the trial court's best interest determination.

STANDARDS GOVERNING PARENTAL TERMINATION TRIAL PROCEEDINGS AND
APPELLATE REVIEW

The Tennessee Supreme Court has described the appellate review of parental termination cases as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

The termination of a parent's rights is one of the most serious decisions courts make. As the United States Supreme Court has said, "[f]ew consequences of judicial action are so grave as the severance of natural family ties." *Santosky v. Kramer*, 455 U.S.

- 14 -

745, 787 (1982). "Terminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005), and of "severing forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(l)(1).

A parent has a fundamental right, based in both the federal and state constitutions, to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996) (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993)). This right "is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d at 521-22, n.13 (citing U.S. Const. amend. XIV, § 1; Tenn. Const. art. 1, § 8). Although this right is fundamental, it is not absolute. *Id.* at 522. The State may interfere with parental rights only in certain circumstances. *Id.* at 522-23; *In re Angela E.*, 303 S.W.3d at 250-51. Our legislature has listed the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists, *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "'Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings.'" *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted)). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

As a reviewing court, we "must 'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). Then, we must determine "whether the combined weight of the facts . . . clearly and convincingly establishes all of the elements required to terminate" a party's parental rights. *Id.* (citing *In re Tiffany B.*, 228 S.W.3d at 156, and *In re S.M.*, 149 S.W.3d

632, 640 (Tenn. Ct. App. 2004)). "When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to witnesses' credibility." *Id.* (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

Once a ground for termination is established by clear and convincing evidence, the trial court or the reviewing court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005), and *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006).

ANALYSIS

A. Grounds for Termination—

1. Substantial compliance.

We first consider the trial court's termination of Mother's parental rights based on her substantial noncompliance with the permanency plan. Tennessee Code Annotated section 36-1-113(g)(2) allows a court to terminate parental rights where "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4."[8] To succeed under this ground, DCS must "demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Conditions that make foster care placement necessary "may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. The court must then determine whether the noncompliance is substantial. *In re M.J.B.*, 140 S.W.3d at 656. In assessing a parent's substantial noncompliance with a permanency plan, the court should measure "both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

---

[8] Our Supreme Court has held that "proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent." *In re Kaliyah S.*, 455 S.W.3d at 555. Rather, reasonable efforts is one of the factors to be weighed in the best interest determination. *Id.*

In the present case, the first permanency plan identified the following areas of concern with respect to Mother: residential instability, mental health, parenting, substance use, communication, and transportation. In order to address these concerns, Mother was required to complete the following action steps: maintain safe, stable, and adequate housing for at least three months; provide background checks on any occupants in the residence; notify DCS of any changes of residence or occupants of the residence within one day; be available for random home visits; provide proof of housing to DCS; complete a mental health assessment and follow all recommendations; provide proof of completion of the mental health assessment to DCS; sign all necessary consent forms to allow DCS to access her records; complete a full psychological evaluation and follow all recommendations; complete parenting classes; complete a parenting assessment if deemed necessary by staff after completion of parenting classes; participate in supervised visitation and follow the guidance of the visitation supervisor; demonstrate appropriate boundary setting and discipline with Lesley, avoid inappropriate conversation with Lesley, and establish appropriate parent/child roles in her relationship with Lesley; complete an alcohol and drug assessment; complete all recommendations of the alcohol and drug assessment and remain in full compliance with services until successfully discharged by the provider; provide a certificate of completion of recommended services to DCS within ten business days; provide proof of all prescriptions to DCS on an ongoing basis as requested by the Department; submit to random drug screens, including hair follicle, nail bed testing, and random pill counts; participate in family therapy; demonstrate the skills she is learning in family therapy in her interactions with Lesley; and establish a transportation plan.

Under the second permanency plan developed on December 17, 2017, the Department included an additional area of concern for child behavior due to inappropriate conversations regarding the case during Mother's visitation with Lesley. As to this area of concern, Mother was assigned the following action steps: provide necessary items to meet the child's needs during visitation; call Lesley three times a week at set times; arrive at visitation on time; engage in appropriate conversation during visitation; and sign all required releases to allow DCS to provide appropriate case management services. Another added area of concern was finances because it was reported that Mother had not made payments on her child support obligation since her case was opened. Under this area, Mother's action steps were to pay child support as ordered by the court and provide DCS with proof of compliance. Under the area of mental health, Mother was given additional action steps to participate in medication management (as recommended in the mental health assessment) and provide documentation of her ongoing participation. Finally, there was a concern regarding abuse because Lesley disclosed to her counselor that Mother had smacked or hit her during an argument. Mother was to participate in anger management-focused counseling and follow all recommendations.

Mother argues that many of the action steps in the permanency plans were not reasonably related to the conditions that caused Lesley to enter state custody—namely,

educational neglect and Mother's failure to provide adequate supervision. This argument reflects a misunderstanding of the applicable legal principles. In *In re Valentine*, our Supreme Court discussed the statutory language found in Tenn. Code Ann. § 37-2-403(a)(2)(C), that permanency plan requirements must be "reasonable and related to remedying the conditions that necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547. As mentioned above, the Court determined that "[c]onditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *Id.* Similarly, in *Department of Children's Services v. C.L.*, No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *23 (Tenn. Ct. App. Aug. 29, 2003), this court declined to consider a parent's alleged failure to comply with a condition that it found was "not related to the conditions that led to removal of the children or to remedying conditions that required that the children remain in foster care."

Thus, to be reasonably related to remedying the conditions that necessitated foster care placement within the meaning of Tenn. Code Ann. § 37-2-403(a)(2)(C), the action steps in the permanency plans must be reasonably related to the conditions that led to Lesley's removal or reasonably related to remedying conditions that impede reunification of the family. In this case, the key conditions identified by DCS and the trial court as requiring Lesley to remain in foster care were Mother's residential instability, mental health issues, and substance use problems. When we consider the action steps in the DCS permanency plans as means to remedy these conditions, we find them to be reasonable.

On appeal, Mother further argues that the juvenile court erred in its December 18, 2017 order ratifying the second permanency plan because the court failed to make specific findings concerning her compliance with all of the requirements of the first permanency plan. The court generally found that Mother was not in substantial compliance "in that she has no housing; failed to follow recommendations; and drug screens." Mother cites nothing that would require the juvenile court to make such findings, and she failed to appeal the juvenile court's December 18, 2017 permanency order, which is a separate proceeding from the present termination case. In the juvenile court's termination order, the order at issue in this appeal, the court made the following findings:

> [T]he Court finds that there is clear and convincing evidence the Respondent failed to substantially comply with the permanency plans as ratified by the Court on June 13, 2017. Upon the testimony of Jennifer Harris, Representative of the Department of Children's Services, the permanency plans required Respondent, [Mother] to pay child support; consistently visit with the child; maintain safe and suitable housing; complete parenting classes; participate in and complete alcohol and drug assessments and follow all recommendations; participate in and complete mental health assessment and follow all recommendations; submit to

- 18 -

random drug screens and pill counts; complete a full psychological; maintain stable transportation; and maintain contact and cooperation with the Department.

. . . .

The Court finds by Clear and Convincing Evidence that respondent, has not substantially complied with the responsibilities and requirements set out for her in the permanency plans. Respondent has not followed through with the recommendations of the alcohol and drug assessment, mental health assessment or psychological evaluation; not consistently submitted to random drug screens or pill counts; does not have stable or appropriate housing; and has not stayed in consistent contact with the department.

Thus, the court enumerated the ways in which Mother failed to substantially comply with the permanency plans.

In its termination order, the juvenile court noted that "the three main root issues" in Mother's case were "the alcohol and drug issues, mental health issues, and stable housing." Although she completed an alcohol and drug assessment, Mother consistently denied having a substance abuse problem and resisted recommendations that she receive individual counseling to address her dependency. The Department had difficulty finding Mother to perform random pill counts, and she was unable to provide documentation for many of her prescription medications. A hair follicle test in August 2017 was positive for multiple opiates. During the time when Lesley was in foster care, Mother moved four times. At the time of the hearing, she had recently moved into a trailer in Lancing, but the Department had not yet been able to approve the residence. Mother had made some progress toward a transportation plan in that she had obtained a driver's license.

We conclude there is clear and convincing evidence to support the trial court's decision to terminate Mother's parental rights on the ground of substantial noncompliance with the permanency plan.

2. Failure to establish a suitable home.

Abandonment by failure to provide a suitable home occurs under the following circumstances:

The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the

- 19 -

department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2016) (amended effective July 1, 2018). Thus, the statute requires the Department to prove, with respect to the relevant four-month time period, three elements: (1) the parent failed to make reasonable efforts to provide a suitable home, (2) DCS "made reasonable efforts to assist the parent . . . to establish a suitable home," and (3) the parent "demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii). In the context of Tenn. Code Ann. § 36-1-102(1)(A)(ii), a "suitable home" means "'more than a proper physical living location.'" *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home must "be free of drugs and domestic violence." *Id.* In this case, the four-month time period following the child's removal runs from April 12, 2017, to August 11, 2017.

As required under Tenn. Code Ann. § 36-1-102(1)(A)(ii), Lesley was removed from the home as the result of a petition filed in juvenile court in which she was found to be a dependent and neglected child. Mother argues that DCS failed to make reasonable efforts to assist her in establishing a suitable home, as required by Tenn. Code Ann. § 36-1-102(1)(A)(ii). "Reasonable efforts" has been defined to mean "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1); *see In re C.L.M.*, No. M2005-00696-COA-R3-PT, 2005 WL 2051285, at *9 (Tenn. Ct. App. Aug. 25, 2005) (applying Tenn. Code Ann. § 37-1-166(g)(1) definition to case involving abandonment by failure to provide suitable home). Thus, counseling services and recommendations arising therefrom have been found to be "directly related to the establishment and maintenance of a suitable home." *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009). Moreover, "the

Department does not bear the obligation to establish a suitable home alone, and parents must make their own efforts at reunification." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at \*7 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re C.L.M.*, 2005 WL 2051285, at \*9) (noting that "reunification is a 'two-way street'")). The Department's efforts "to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal . . . ." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(2016).

The Department asserts, and there is clear and convincing evidence to support a finding that, it made reasonable efforts to assist Mother to establish a suitable home for Lesley. The Department's reasonable efforts included reviewing and discussing the termination criteria with Mother, creating two permanency plans, supervising visitation, offering to reimburse her for transportation for visitation, and offering to provide bus passes. Furthermore, the Department offered to assist Mother with both rent and utilities at her McElhaney Road home. As detailed above, the Department also provided mental health and alcohol and drug assessments and made recommendations for further treatment in those areas, which DCS offered to facilitate.

Mother argues on appeal that the Department "never tried to set up an appointment before the [family service worker's] visits, rather she would just drop in and try to catch [Mother] at the home in Wartburg." As Ms. McElhaney stated in her testimony, she was required to do random home visits and random drug screens in order to confirm the information given to her by the client. If she informed the client before the visit, this would defeat the purpose of the visit being random. Mother further argues that Ms. Harris did not testify that there were "concerns or safety issues with the home of Ms. Mable Webb." According to Mother's logic, "one can only assume that the home was safe and appropriate when there is no evidence indicating anything to the contrary." There are several problems with this reasoning. First, Mother moved out of Ms. Webb's home because she reported that the house was infested with bed bugs and that Ms. Webb suffered from dementia. Second, although Ms. Harris met Mother outside Ms. Webb's residence, she had doubts as to whether Mother was actually living there. The room Mother showed her did not appear to be lived in; there were no signs that Mother was living there. It appeared to Ms. Harris that Mother had just been dropped off at Ms. Webb's house by a friend; she was wearing the same clothes she had been wearing the previous day. We find Mother's argument unconvincing.

As to the second and third prongs of the statutory analysis, we find clear and convincing evidence to support the trial court's findings that Mother failed to make reasonable efforts to establish a suitable home and that she demonstrated such a lack of concern for Lesley that it appears unlikely that she will be able to establish a suitable home at an early date. Although Mother secured housing shortly before the hearing, the Department had not yet had the opportunity to verify the new residence. Moreover,

- 21 -

Mother continued to deny her substance abuse problem and failed to follow the necessary steps to ensure a drug-free home. The trial court found:

> Upon testimony of Jennifer Harris, Family Service Worker, and all other evidence presented, the court finds by clear and convincing evidence that the Respondent continues to have unstable housing and during the first four months the child was in custody, [Mother] resided in three different residences; has failed to follow the recommendations of her alcohol and drug assessments; failed to even acknowledge substance abuse issues or submit to random drug screens and pill counts; and has made no reasonable effort to regain custody of the child.

We conclude that there is clear and convincing evidence to support the trial court's determination that Mother's parental rights should be terminated on the ground of failure to provide a suitable home.

3. Persistent conditions.

Tennessee Code Annotated section 36-1-113(g)(3) authorizes termination of parental rights when:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3) (2017) (amended effective Mar. 14, 2018). As this court has previously stated, the purpose behind this ground is "'to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.'" *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *6 (Tenn. Ct. App. May 28, 2014) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d 838, 874 (Tenn. Ct. App. 2005). The court must determine "the likelihood that the child can be safely returned to the custody of the mother, not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). To prove the existence of this ground, it is not necessary for DCS "to prove that a parent-child relationship cannot be salvaged" or "to show that a parent is 'currently harmful' to a child's safety or future emotional stability." *In re Jamazin H.M.*, 2014 WL 2442548, at *6 (quoting *In re K.A.H.*, 2000 WL 1006959, at *5). "A parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care." *Id.*

As the statute provides, the persistent conditions may include not only those that led to the child's removal, but also "other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect." Tenn. Code Ann. § 36-1-113(g)(3)(A). In this case, the persistent conditions include Mother's substance abuse and neglect (as evidenced by her failure to provide suitable housing). Although Mother completed an alcohol and drug assessment, she failed to follow the recommendations designed to address her prescription drug dependency. The Department was often unable to find Mother to administer the required drug screens and pill counts. When Mother did submit to a pill count, she was unable to provide documentation for her many prescription drugs. A hair follicle drug test in August 2017 was positive for both opiates (codeine) and extended opiates (hydrocodone and oxycodone). Mother has consistently denied having a substance abuse problem despite the opinions of evaluators to the contrary.

As to Mother's failure to secure stable housing, she points out that she did obtain housing shortly before the hearing. Mother is to be commended for doing so. Nonetheless, she has moved four times since Lesley has been in DCS custody and was homeless for a period of time. It remains to be seen whether Mother will live in the new residence for an extended period. Moreover, at the time of the hearing, the Department had not determined whether the new residence was satisfactory under DCS standards.

Under subsection (B) of the statute, the Department must prove that "[t]here is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to [Mother] in the near future." In this context, "the history of past behavior is relevant to the issue of future behavior." *Dep't of Children's Servs. v. C.B.H.*, No. E2003-03000-COA-R3-PT, 2004 WL 1698209, at *2 (Tenn. Ct. App. July 29, 2004). With respect to Mother's substance abuse, in particular, DCS has had contact with her over a long period of time, and she has exhibited a lack of willingness or an inability to

acknowledge or to address this problem. Thus, there appears to be little chance that she will remedy this condition in the near future.

As a result, DCS argues, "[t]he continuation of the [Mother] and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3)(C). The Department asserts that Lesley has caught up in school by attending a summer program, resides in a stable environment, and has received good grades in all of her classes. Her safety and stability would be threatened should she be returned to Mother's care. Based upon all of the available evidence, we agree that the evidence preponderates in favor of a finding that the continuation of the parent-child relationship would diminish Lesley's chances of integration into a stable home.

The trial court made the following pertinent findings regarding the persistence of conditions ground for termination:

> In this case, pursuant to Tenn. Code Ann. §§ 36-1-113(g)(3), the Court finds that there is clear and convincing evidence that the conditions which led to the child's removal from [Mother's] home still persist, and prevent the child's safe return to [Mother's] care.
> The child entered state custody on April 11, 2017, pursuant to bench order of custody which found probable cause that the child was dependent and neglected due to significant truancy and shortly after the bench order the issue of drug and alcohol abuse arose as well as lack of suitable housing. The child was adjudicated dependent and neglected on May 10, 2017, based, in part, on a stipulation by [Mother] that the child was dependent and neglected in [her] care due to significant truancy and substance abuse issues. The child has remained in foster care continuously since April 11, 2017.
> . . . .
> . . . During the 11 months that this child was in state custody, [Mother] did not: follow the recommendations of her alcohol and drug assessment; has not maintained stable housing. Instead of improving their personal condition, [Mother] continues to abuse her prescription drugs and continues to deny there is any abuse to address; and has been bouncing from residence to residence since the child entered custody.

Mother's arguments on appeal include the assertion that there is no evidence of her abuse of prescription drugs. We disagree. The record includes the results of a hair follicle drug test showing the presence of multiple opiates and Mother's failure to document the many prescription drugs she had in her possession. Furthermore, prescription records for several months in 2017 showed prescriptions for opiates from multiple doctors.

We have determined that there is clear and convincing evidence to support the trial court's determination that Mother's parental rights should be terminated on the ground of persistence of conditions.

B. Best Interest—

Having determined that clear and convincing evidence exists to terminate Mother's parental rights on three different grounds, we next consider whether the trial court properly determined that termination is in the child's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2). After a court finds that clear and convincing evidence exists to support a ground for termination, the child's interests diverge from those of the parent and the court focuses on the child's best interests. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *Id.* Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.*

The facts a court considers in its best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555. Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The non-exclusive factors a trial court is to consider in determining whether terminating a parent's rights to a child is in the child's best interest are set forth in Tenn. Code Ann. § 36-1-113(i):

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Every factor need not be applicable for the trial court to determine it is in the best interest of a child for a parent's rights to be terminated. *See In re Audrey S.*, 182 S.W.3d at 878. The best interest analysis is "a fact-intensive inquiry" requiring the court to consider the unique facts of the case "from the child's, rather than the parent's, perspective." *Id.* (citing *White v. Moody*, 171 S.W.3d at 194).

In concluding that termination of Mother's rights was in the best interest of the child, the trial court found, in pertinent part:

[T]he Court looks to Tennessee Code Annotated 36-1-113, and as to subfactor (1), the Court finds that [Mother] has not made such an adjustment of circumstance, conduct or conditions as to make it safe or in the child's best interest to be in the home; does find that the parent has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such a duration of time that a lasting adjustment does not reasonably appear possible. The Court does, however, find that [Mother] has maintained somewhat regular visitation with the child. It's not been perfect, but she has done decently well in maintaining that, that there is a meaningful relation between Lesley . . . and [Mother]. It's unclear as to whether a change of caretaker or custodian would cause any emotional or psychological or medical condition to the child. Number 6 is not applicable. The Court finds that the physical environment of the home is not healthy and safe; that, quite frankly, three weeks does not show stability of housing; that there is, in the Court's position, still abuse of controlled substances, despite prescriptions, that would likely render the

parent to be unable to care for the child in a safe, stable manner, because, quite frankly, nothing has changed from the time that the child came into custody in that aspect. The Court finds that the parent's mental and emotional status would be detrimental to the child at this point due to her unwillingness and inability to address her underlying substance abuse issues; and that Number 9 is not applicable. The Court also finds that due to severe lack of supervision in the past and the fact that she is now in a home with structure and stability and she now has significant improvement in attendance and very good grades, and, quite frankly, in addition to that, the Court finds that the statement by [Mother], referring to a previous case, sums up the duality of [Mother's] goals in this case. She stated that "I got my daughter back and kept my medicines too." The Court finds that that sums up the issue in this case, that she has competing interests. She loves her daughter, but she doesn't want to give up the medicine that clearly, the Court finds, has severely affected [Mother's] ability to parent.

The trial court concluded that termination of Mother's parental rights was in the best interest of the child.

The evidence does not preponderate against the trial court's findings of fact, and we conclude that those facts constitute clear and convincing evidence to support the trial court's determination that the termination of Mother's parental rights is in the child's best interest.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Joyce A., and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE